# Declaration of Kent Tedin

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      My name is Kent L. Tedin. I live at 5808 Annapolis in Houston, Texas.

## I. Qualifications for Expert Testimony Based on Survey Research

2.      I received a B.A. in political science in 1966 from Concordia College, Moorhead, Minnesota; I received an M.A. in political science from the University of Iowa in 1969, and a Ph.D. in political science from the University of Iowa in 1973.

3.      I taught at the College of William and Mary in 1973-1974, and in the fall of 1974 I began teaching at the University of Houston, where I remain on the faculty. I am currently professor of political science, and was chairman of the department between September 1, 1986 and August 31, 2002.

4.      My major teaching areas are public opinion, survey research methods and statistics. I have taught a graduate course titled Survey Research Methods numerous times as well as a graduate course titled Public Opinion. I am currently (Fall 2016) teaching the graduate seminar on public opinion.

5.      I have published papers using opinion data in every major peer-reviewed journal in political science, including the *American Political Science Review, Journal of Politics*, *American Journal of Political Science, Political Research Quarterly,* and The *Public Opinion Quarterly*. I am coauthor of *American Public Opinion: Its Origins, Content and Impact*, generally regarded as the leading text in the field.[1] The book is now in its ninth edition (2015). I have made numerous presentations at professional conferences on public opinion. I have served on the editorial boards of *Youth and Society* and *Women and Politics.* My vita is attached as Appendix G, and incorporated herein by reference.

6.      In the course of a more than 40 year career, I have conducted either alone or in collaboration, hundreds of public opinion surveys. These include surveys that were published in peer-reviewed journals, media surveys, pre-election surveys, exit poll surveys, surveys for commercial clients, and opinion surveys presented as evidence in state and federal court.

7.      I have conducted venue surveys in fourteen different cases that were presented in court by affidavit, by report or in trial testimony. Of these, ten I conducted alone, and these ten I describe in the remainder of this paragraph. I conducted a venue survey in Galveston County, Texas in a capital murder case, *Eroy Brown v. State of Texas*. In the trial of Timothy McVeigh, accused (and convicted) of bombing the Murrah Federal Building in Oklahoma City, I conducted

---

[1]John Geer, *From Tea Leaves to Opinion Polls* (New York: Columbia University Press), p. 56.

surveys in seven different venues for a pretrial motion to move venue made by Stephen Jones, attorney for Timothy McVeigh. The United States government also conducted surveys in some of these venues. I conducted surveys in two venues for the *National Collegiate Athletic Association* (NCAA) in a suit brought against them by former University of Nevada--Las Vegas basketball coach, Jerry Tarkanian. I conducted a venue survey in Jackson County, Missouri for Amoco Oil in a lawsuit brought against it for allegedly polluting property in the city of Independence, Missouri. I conducted a venue survey in Harrison County, Mississippi where it was alleged that biased media coverage created a climate of hostility for defendants in a civil lawsuit. I conducted a venue survey in Adams County, North Dakota on the same issue, where an insurance company believed it could not get a fair trial due to adverse media publicity concerning the death of a well-known local resident. I conducted a venue survey in Jackson County, Missouri in connection with the death of Kansas City Chiefs' all-pro linebacker Derrick Thomas, resulting from the roll-over of a Chevrolet SUV he was driving. Chevrolet and others did not believe they could get a fair trial due to the popularity of the Mr. Thomas and the widespread publicity surrounding the case. I conducted venue surveys in Leslie County, Kentucky and Garrard County Kentucky. I conducted a venue change survey in 2007 for State Farm Insurance regarding a case brought by homeowners for damages due to Hurricane Katrina, and I conducted a venue change survey for the trial of Brian David Mitchell for the kidnapping and assault of 13-year-old Elizabeth Smart in Utah.

8. In the other four venue surveys, I collaborated with Dr. Richard Murray. One was for the city of Austin, Texas the case of *Decker Coal Company vs. City of Austin, Texas.* This case involved a dispute over the interpretation of natural gas contracts. Another was *City of Garland, Texas and Others vs. Comanche Peak Power.* The City of Garland and several other small cities in Dallas County were suing to avoid paying cost overruns in the building of the power plant. The cities did not believe they could get a fair trial in Dallas County. Another was a survey conducted for Houston Lighting and Power, which involved litigation over the assessed valuation of its power generating plant on the Brazoria County tax rolls. HL&P requested a move from this venue because its property taxes provided major funding for the public schools. Dr. Murray was also a collaborator in the Timothy McVeigh case.

9. I have testified in both state and federal court a number of times as a statistical expert. My testimony as an expert witness has never been excluded.

## II. Background for the Current Venue Change Survey

10. In August of 2016 I was contacted by Cullen Wojcik, attorney for one of the eight defendants under federal indictment for conspiracy to commit fraud by failing to pay rebates owed to trucking companies who had purchased fuel from Pilot Flying J. After reviewing the facts of the case, I agreed to undertake the work.

11. The venue of original jurisdiction is the United States District Court for the Eastern District of Tennessee, Northern Division at Knoxville (hereinafter "Eastern District"). I surveyed as the alternative the United States District Court, Middle District of Tennessee,

2

Nashville Division (hereinafter "Middle District"). Pilot Flying J is headquartered in Knoxville. A trial in the Middle District of Tennessee would be held in Nashville, which is about 160 miles from Knoxville. Data in this report will demonstrate that the events leading to the indictment of the eight defendants have received less prejudicial pre-trial publicity in the Middle District than in the Eastern District.

## III. Design of the Survey

12.　An effective method for the trial court to determine if a venue change is necessary is to weigh evidence from a scientifically conducted community opinion survey, where prejudicial case-related information in the venue of original jurisdiction is contrasted with that same information in an alternative venue.

13.　I designed such a survey based on the accepted procedures in the field of survey research. I consulted standard reference sources in the field on sampling and question wording, including the chapter on survey research methods by Shari S. Diamond, in the Federal Judicial Center's *Reference Manual on Scientific Evidence*.[2] In particular, care was paid to the wording of questions to insure the language was neutral and questions were not leading.

14.　The fieldwork for the survey was conducted by Promark Research of Houston, Texas. Promark has been in existence since 1997, and has conducted thousands of opinion surveys. I have used them numerous times in the past, and they did the survey field work for the change of venue motion affidavits I filed on behalf of State Farm Insurance in its defense of suits brought by policy holders claiming their polices covered water damage from Hurricane Katrina. I also used Promark for the survey work I conducted on behalf of General Motors when it was sued by the family of the late Kansas City Chief's all-pro linebacker Derrick Thomas.

15.　The sample for this study was purchased from Survey Sampling, Inc.[3] The number of respondents interviewed is 315 in the Eastern District and 309 in the Middle District. The last question in the survey asked if the respondent was a convicted felon, and if so, did the person have his or her civil rights restored. In the Eastern District, that question disqualified 4 people; in the Middle District, it disqualified 11 people. These disqualifications yielded a working sample of 311 respondents in the Eastern District and 298 in the Middle District. A sample size between 297 and 311 respondents has a sampling error of plus or minus 5.7 percent in each venue.

16.　One half of the respondents were interviewed by landline and one half were interviewed by cell phone (see Appendix C for more details). Respondents were contacted using Random Digit Dialing. Within parameters, phone numbers were chosen randomly. This methodology

---

[2]Shari S. Diamond, "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* 3rd edition (Federal Judicial Center, 2011).

[3] The sample is a probability (random) drawn scientific sample of cell phone numbers and landline numbers. The sample was constructed in fashion as to allow for scientific inferences from the sample to the population.

3

insures that those with unlisted phone numbers are called. The probability of someone being called with an unlisted phone number is the same as someone with a listed phone number.[4] This methodology insures a representative sample of residential phone numbers. Phone numbers were called a total of three times before being replaced in the event no one answered after three calls. For landlines, respondents were selected using a male/female rotation.[5] Also for landlines, the sample was weighted based by the number of adults in the household to adjust for unequal probability of selection.[6] For cell phones, the person answering the phone was interviewed.

17.    Respondents were told their participation in the survey was voluntary, and that their answers were confidential. The exact language was: *"Your cooperation is voluntary; you may answer "no opinion" or "undecided" to any question, and your answers are confidential."*

18.    Screening questions were used at the outset of the interview to ensure that the respondents interviewed were qualified for jury service based on the criteria for jury service in the applicable district. Respondents were asked if they were a United States citizen and a resident of the state of Tennessee. In the case of the Eastern District, respondents were asked if they were a registered voter. In the case of the Middle District, respondents were asked whether they were a registered voter, and whether they had a valid Tennessee driver's license or a state-issued identification card. Respondents were also asked in which county they lived. The demographics of age, sex, marital status, and race/ethnicity were determined for each respondent, and compared against the same data from the American Community Survey. However, these benchmark comparisons are only approximate. In the case of the Eastern District, we interviewed only registered voters, so benchmark comparisons are not going to be precise because the benchmarks are based on the total adult population. About 70 percent of the adult population are registered voters. Also, for both venues we limited the number of respondents 70 years of age and older to two percent. Those 70 and over eligible for jury service can request to be excused based on their age. However, some do occasionally serve, so I allowed two percent of the sample to be 70 years old or older. Despite these imprecisions, we did not see any major discrepancies from the Census benchmarks that warranted weighting the sample. A final question asked respondents if they had ever been convicted of a felony and *not* had their civil rights restored. As noted above, those ineligible for jury service were deleted from the sample.

19.    A copy of the questionnaire with complete responses for the Eastern District is attached as Appendix A1; for the Middle District it as attached as Appendix B1.

### IV. General Awareness of Pilot Flying J by Venue

20.    The survey started with a general question asking how often respondents followed the business news (see Appendix A1 and Appendix B1 for the distributions). The item served as a

---

[4] See Robert S. Erikson and Kent L. Tedin, *American Public Opinion* 9th edition (Pearson 2015), 32-37.
[5] Interviewers ask to speak to the youngest male over 18 in the household. If no male is present they ask to speak to the youngest female over 18 in the household.
[6] See Gary T. Henry, *Practical Sampling* (Sage: 1990).

4

soft introduction to the following three questions asking about the visibility of Pilot Flying J and two other corporations headquartered in Tennessee.

21.     We asked respondents how much they had read or heard about Federal Express and Dollar General, the two largest corporations based in Tennessee, and about Pilot Flying J. The response options were "a lot," "something," "just a little," or "nothing." The results are shown in Table 1 below.

22.     What is interesting about Table 1 is there is no statistically significant difference between venues on how much they have read or heard about Federal Express.[7] However, those in the Middle District are more likely to have read or heard about Dollar General than those in the Eastern District. The difference is statistically significant (p. < .01). The reason is likely because Dollar General is the fifteenth largest employer in the "Nashville Region"[8] and does not even make the top fifty in the "Knoxville area."[9]

23.     On the other hand, when asked about Pilot Flying J, the residents of Eastern District have read and heard much more than have residents of the Middle District (p.<.001). While the difference by venue between the first two companies is non-existent or minor, when it comes to Pilot Flying J, differences between jury-eligible respondents in the Eastern District and Middle District are substantial. Fifty-four percent in the Eastern District has read or heard "a lot" about Pilot Flying J compared to just 29% in the Middle District. While only 11% in the Eastern District had read or heard "nothing" about Pilot Flying J, 35% gave the answer of "nothing" in the Middle District.[10]

## Table 1
### How much has respondent read or heard about Federal Express?

| Category | Eastern District | Middle District |
|---|---|---|
| A lot | 22% | 26% |
| Something | 23% | 21% |
| A little | 25% | 25% |
| Nothing/Unsure | 29% | 28% |
| **Total** | **100%** | **100%** |
| N | (310) | (298) |

p. = n.s. (nonsignificant)

---

[7] Due to rounding, percentages may not always add to 100%. If due to rounding percentages are 99% or 101% they will be reported as 100%.

[8] http://www.nashvilleareainfo.com/homepage/relocation-expansion/major-employers

[9] https://www.google.com/#q=largest+employers+in+knoxville+region

[10] Give the small number of "unsure" responses they are combined with the "nothing" in Table 1.

**How much has respondent read or heard about Dollar General?[11]**

| Category | Eastern District | Middle District |
|---|---|---|
| A lot | 32% | 44% |
| Something | 23% | 22% |
| A little | 22% | 20% |
| Nothing/Unsure | 23% | 15% |
| **Total** | **100%** | **100%** |
| N | (310) | (298) |

p. < .01

**Table 1 (cont'd)**
**How much has respondent read or heard about Pilot Flying J?**

| Category | Eastern District | Middle District |
|---|---|---|
| A lot | 54% | 29% |
| Something | 20% | 16% |
| A little | 15% | 21% |
| Nothing/Unsure | 11% | 34% |
| **Total** | **100%** | **100%** |
| N | (311) | (298) |

p. < .001

24.     We next asked if respondents knew the city in which Pilot Flying J had its headquarters. By an overwhelming margin the residents of the Eastern District were able to correctly report that Pilot Flying J was headquartered in Knoxville, as seen in Table 2 below. Fewer than half as many in the Middle District could offer the correct answer. The majority in the Eastern District gave the correct answer; a majority in the Middle District answered "I don't know."

**Table 2.  In what Tennessee city does Pilot Flying J have its National Headquarters?**

| Category | Eastern District | Middle District |
|---|---|---|
| Knoxville | 67% | 25% |
| Nashville | 03% | 05% |
| Other | 00% | 05% |
| Don't Know | 31% | 65% |
| **Total** | **100%** | **100%** |
| N | (311) | (298) |

p. <.001

---

[11] At the base of the table p. <.01 means the relationship in the table would occur fewer than 1 in 100 times by chance.

6

25.    In summary, we have at the outset, using unbiased questions with no mention of criminal prosecution[12] of the eight Pilot Flying J employees, demonstrated that people are substantially more aware of Pilot Flying J in the Eastern District than in the Middle District. The most plausible explanation is media coverage due to the location of Pilot Flying J's headquarters in Knoxville, and the fact that it is a major employer in the area.

26.    Toward the end of the questionnaire we posed an open-ended question asking respondents to provide the name of the family that owned Pilot Flying J.[13]  In Eastern District 65% could accurately volunteer the name "Haslam" compared to 35% in the Middle District. The item simply reinforces the data presented above that residents of the Eastern District are notably more knowledgeable about Pilot Flying J than those in the Middle District.

## V. Newspaper Accounts in the Eastern and Middle Districts

27.    In Table 3 below, we present an analysis of newspaper stories in the *Knoxville Sentinel* and the Nashville-based *Tennessean* about the events relevant to the prosecution of the eight Pilot Flying J employees for conspiracy to commit criminal fraud. Using the Internet, I entered the terms "Pilot Flying J" and "Fraud" in the archives portion of the websites for each newspaper.  Beginning in February 13, 2013 through September 15, 2016 I did a count of the number of stories about the events leading to the indictment of the Pilot Flying J employees. In my count I *did not* include any other accusations of wrong doing by Pilot Flying J, such as overcharging credit cards among those purchasing fuel from its truck stops.  I am relying on only a count of the headline and a brief textual description that is publicly available free of cost from both newspapers by entering the keywords "Pilot Flying J" and "Fraud" into their archival websites.  The actual data taken from the newspaper archives is presented in Appendix E, which includes a verbatim transcription of the headline, and a (mostly) verbatim transcription of accompanying text.  Again, all I am presenting is a count from two newspapers.  No other media sources are included. Table 3 shows that almost three times as many stories relevant to the indictment of eight Pilot Flying J employees were published in the *Knoxville Sentinel* than in the *Tennessean* from April 1, 2013 through September 15, 2016.

**Table 3. Count of Newspaper Articles about Prosecution of Pilot Flying J Employees Beginning April 1, 2013**

| Newspaper | Count of Stories |
|---|---|
| *Knoxville Sentinel* | 176 |
| *Nashville Tennessean* | 61 |

---

[12] I mean generic questions such as those asking in what city Pilot Flying J is located, as opposed to a question that references the prosecution.

[13] The question was asked toward the end of the questionnaire so as not to influence the guilty/not guilty question or the questions about what respondents had read or heard about the prosecution.

7

28.     Table 3 shows that many more stories about wrongdoing by employees of Pilot Flying J appeared in the *Knoxville Sentinel* than the *Nashville Tennessean*. Further, in the Eastern District the absolute numbers of stories about alleged illegal activities by employees of Pilot Flying J are numerous (as reflected in Table 3) and frequent. Finally, we are only looking at one source of pretrial publicity that would prevent the defendants from getting a fair trial in the Eastern District. As discussed below, the survey data confirms that much greater media penetration, in terms of television and the Internet, regarding the prosecution of the Pilot Flying J employees has occurred in the Eastern District than in the Middle District. The survey data also confirm what Table 3 shows regarding the newspapers.

### VI. Awareness of the Criminal Prosecution in the Eastern and Middle Districts

29.     Given that our count of newspaper headlines and text shows substantially more coverage in the Eastern than the Middle District of events leading to the criminal indictment of eight Pilot Flying J employees, we would expect survey data to show a much greater awareness of the prosecution in the Eastern than the Middle District, including awareness of information prejudicial to the ability of the defendants to receive a fair trial.

30.     We began by asking respondents if they had read, heard or seen anything about the events surrounding the criminal indictment of the eight Pilot Flying J employees. The exact question read:

> *Pilot Flying J sells diesel fuel to truck stops and trucking companies. On February 3rd 2016, the federal government indicted eight Pilot Flying J employees, including some top level executives, on charges of criminal conspiracy to commit fraud. The Federal Government alleges that these eight employees conspired, for personal and company financial gain, to defraud trucking companies of tens of millions of dollars in cash bonuses or rebates owed to these fuel buyers by Pilot Flying J. Have you read, heard or seen anything about events surrounding the criminal fraud indictment brought by the federal government against these eight Pilot Flying J employees? [IF YES, ASK]: Have you seen, read or heard a lot, something, or just a little about the events surrounding the criminal indictment?*

31.     The data in Table 4 show what we would expect given the much greater newspaper coverage in the Eastern District than in the Middle District, as shown in Table 3. Among those eligible for jury service in the Eastern District, 39% have seen, read or heard "a lot" about the prosecution compared to just 15% in the Middle District. Forty-nine percent in the Eastern District have seen, read or heard at least "something" relevant to the prosecution of the Pilot employees compared to 31% in the Middle District.

32.     On the other hand, over half of those eligible for jury service in the Middle District have seen, read or heard *absolutely nothing* about the prosecution of the Pilot employees, compared to slightly less than a quarter in the Eastern District.

8

**Table 4. Amount of jury pool eligible respondents have 'seen, read, or heard' about events surrounding the criminal indictment of eight Pilot Flying J employees**

| Response | Eastern District | Middle District |
|---|---|---|
| A lot | 39% | 15% |
| Something | 20% | 16% |
| Just a little | 17% | 15% |
| Nothing | 24% | 55% |
| **Total** | **100%** | **100%** |
| N | (310) | (298) |

p. < .001

33.     We next asked from what specific sources the jury-eligible respondents received their information about the Pilot Flying J criminal prosecution: television, the *Knoxville Sentinel* (for the Eastern District) the *Tennessean* (for the Middle District), and/or the Internet. More people received information from each medium in the Eastern District than in the Middle District. Most notable from Table 5 is that over half of the jury-eligible respondents in the Eastern District saw and heard television stories about the criminal indictment of the eight Pilot Flying J employees, versus only 22% in the Middle District.

**Table 5.  Source of information about Pilot employee persecution by venue**

| Medium | Eastern District | Middle District |
|---|---|---|
| Television | 52% | 22% |
| Newspapers | 32% | 15% |
| Internet | 37% | 21% |
| N | (310) | (298) |

p. < .001

34.     We can elaborate further on Table 5 by noting that respondents could receive information from multiple sources.  The data show that 41% of the Eastern District respondents received information about the prosecution of the employees from two or more of the sources in Table 5 compared to just 18% for the Middle District. One can infer from Tables 4 and 5 that the flow of information about this case is at least twice as pervasive, if not more, in the Eastern District than in the Middle District.

### VII. Beliefs about the Guilt of the Eight Pilot Flying J Employees

35.     Having ascertained the level of awareness among jury pool eligible respondents, we shall next turn to a description of the extent to which these respondents believe the accused are guilty or not guilty of conspiracy to commit fraud.  The data are shown in Table 6a and 6b below.

36.     Slightly more than one-half of the jury pool in the Eastern District (51%) has concluded that that the eight indicted Pilot Flying J employees are definitely or probably guilty of conspiracy to commit fraud. Less than one-half that number (22%) have arrived at the same conclusion in the Middle District.  In the Eastern District there are three times as many

9

newspaper stories prejudicial to the defendants' presumption of innocence than in the Middle District. As a result, we find more than twice as many jury-eligible respondents concluding the defendants and are definitely or probably guilty in the Eastern District than we find in the Middle District. In Table 6b "definitely" and "probably" guilty or not guilty are taken from Table 6a and merged into single categories.

**Table 6a**
**Are defendants guilty or not guilty of conspiracy to commit fraud?**

| Belief about Guilt | Eastern District | Middle District |
|---|---|---|
| Definitely Guilty | 11% | 05% |
| Probably Guilty | 40% | 17% |
| Undecided | 20% | 19% |
| Probably Not Guilty | 04% | 04% |
| Definitely Not Guilty | 00% | 00% |
| Read, Heard, Seen Nothing | 24% | 55% |
| **Total** | **100%** | **100%** |
| N | (310) | (298) |

**Table 6b**
**Are defendants guilty or not guilty of conspiracy to commit fraud?**

| Belief about Guilt | Eastern District | Middle District |
|---|---|---|
| Guilty | 51% | 22% |
| Undecided | 20% | 17% |
| Not Guilty | 04% | 03% |
| Read, Heard, Seen Nothing | 24% | 55% |
| **Total** | **100%** | **100%** |
| N | (310) | (298) |

**VIII. What the Jury-Eligible Pool Has Read or Heard about Pilot Flying J Litigation**

37.     Next we turned to specifics of what jury-eligible respondents have read, heard or seen about the government case against the eight defendants. Respondents were asked seven questions about specific allegations made in a 58-page indictment dated February 3, 2016. I had no idea how widespread awareness was of these allegations at the time I wrote the questions, knowing only that the government was making the allegations against the defendants. I also included one question that was not factually true, to ensure that respondents were not simply saying "yes" to each of the questions without giving the questions serious thought. That one question asked respondents if they had read or heard that *"Pilot Flying J had been sold to Mark Cuban, owner of the Dallas Mavericks basketball team."* That statement is not true, but might have a certain plausibility given the adverse publicity about Pilot Flying J and the fact that the CEO Jimmy Haslam owns a professional athletic franchise (the Cleveland Browns) and might have a personal or business relationship with fellow franchise owner Mark Cuban. The seven items and the responses to those items are presented in the table below. Most notable is that 65%

10

in the Eastern District has read or heard about the 2013 warrant, 37% have read or heard that people working for Pilot had pleaded guilty and 38% have read or heard that Pilot had been fined 92 million dollars for fraud in its rebate program. These percentages are much smaller in the Middle District.

**Table 7. Percent having read or heard prejudicial information by district**

| Read or Heard Information | Eastern D. Yes | N | Middle D. Yes | N |
|---|---|---|---|---|
| Read/heard Gov't got 2013 warrant seized boxes copied hard drives* | 65% | 310 | 29% | 298 |
| Read/heard Pilot employees rush to AG office to plead guilty* | 25% | 310 | 08% | 298 |
| *Read/heard Pilot sold to Mark Cuban*[a]** | 08% | 310 | 03% | 298 |
| Read/heard about Airplane sale to defrauded customer | 08% | 310 | 06% | 298 |
| Read/heard Pilot took advantage of Hispanics* | 26% | 310 | 11% | 298 |
| Read/Heard People working for Pilot pled guilty* | 37% | 310 | 15% | 298 |
| Read/Heard Pilot fined 92 million dollars* | 38% | 310 | 20% | 298 |

[a]Untrue statement
*$p. < .01$
**$p. < .001$

38.     In the Table 8 below I present a count of the number of indicators of information awareness potentially prejudicial to the defendants taken from Table 7. (The "Mark Cuban" item is excluded). There are six potentially prejudicial information items in Table 7. A member of the jury pool could have read or heard none of them or read and heard all six of them. Table 8 contrasts the number of items jury pool members have read or heard in the Eastern District with the number in the Middle District.

**Table 8. Number of read or heard prejudicial items from Table 7 by venue percent**

| Number read or heard | Eastern District | Middle District |
|---|---|---|
| Zero | 27% | 64% |
| One | 14% | 10% |
| Two | 19% | 11% |
| Three | 20% | 07% |
| Four | 12% | 05% |
| Five | 07% | 02% |
| Six | 02% | 01% |
| N | (310) | (298) |

39.     In the Eastern District, just 27% have *read or heard nothing* prejudicial to the defendants that might prevent them from receiving a fair trial. In the Middle District, however, 64% have read or heard nothing prejudicial to the defendants receiving a fair trial. Twice as many in the Middle District are unaware of information that might prevent the defendants from getting a fair trial.

11

40.     From a different take, 60% of the jury pool in the Eastern District had read or heard *two or more* pieces of information that are deleterious to the chances of the eight indicted Pilot Flying J employees being able to receive a trial free from damning pre-trial publicity.  That same number drops to 26% for the Middle District of Tennessee.

41.     We asked jury pool-eligible respondents if they had had conversations with others about the Pilot Flying J criminal prosecution. In the Eastern District 40% of the jury pool reported having conservations about the prosecution of the defendants with others.  In the Middle District, only 13% reported having such conversations.  Of course, conversations outside the courtroom can be prejudicial to the defendants as attorneys are not present to object to factually incorrect information or speculation about the motives of the defendants or their likelihood of guilt.  Even if the conversations are factually correct, the information exchanged may not be admissible in a court of law.  The fact that 40% of the eligible jury pool in the Eastern District is talking about the criminal prosecutions involving Pilot Flying J and various employees, including the defendants, almost certainly means potentially biasing prejudgments are being formed or reinforced.  It is striking that in the Middle District such conversations have occurred among only 13% of the jury eligible population.

42.     We also asked if the respondent knew anyone who has worked for or currently works for Pilot Flying J; 26% said "yes, they did" in the Eastern District compared to 8% in the Middle District.  Those who know a Pilot Flying J employee are substantially more likely to say the defendants are guilty (58%) than those saying "no, they knew no one" (33%).[14]

### IX. The Relationship between Pre-trial Publicity and Belief the Defendants Are Guilty

43.     Widespread pre-trial publicity is prejudicial to criminal defendants because knowledge about the litigation often results in members of the jury pool coming to a decision about the guilt or innocence of the accused before the trial even begins.  We have already established much greater awareness of the prosecution in the Eastern District than the Middle District.  We shall now demonstrate how that pre-trial publicity affects beliefs about the guilt of the defendants.

44.     In question 11, we asked respondents how much they knew about Pilot Flying J.  Recall from Table 1, jury-eligible respondents in the Eastern District knew much more than those in the Middle District. Table 9 below demonstrates that the more people say they know about Pilot Flying J, the more they are likely to say the defendants are guilty.[15]

---

[14] p.< .001
[15] In remainder of the affidavit "definitely guilty" and "probably guilty" are combined into one category as are "definitely not guilty" and "probably not guilty." The "undecided" category includes those who have not read, heard or seen anything about the case as presented in Table 6a and Table 6b.

**Table 9. Belief in the guilt of defendants by read/heard of Pilot Flying J**

| Read/Heard about Pilot | A lot | Something | A Little | Nothing |
|---|---|---|---|---|
| Defendants Guilty | 55% | 48% | 28% | 04% |
| Undecided | 40% | 47% | 70% | 96% |
| Defendants Not Guilty | 06% | 05% | 02% | 00% |
| **Total** **N=608** | **100%** | **100%** | **100%** | **100%** |

p. < .001

45.     All three specific sources of information show an even stronger pattern. The most troublesome for the defendants is receiving information about the criminal prosecution from the television.  It is the medium that both is most widely viewed and shows the strongest relationship to a belief that the defendants are guilty, as seen in Table 10 below.

**Table 10. Belief in the guilt of defendants by having seen and heard about prosecution on television**

| Saw/Heard about Pilot on TV | Yes | No/Unsure* |
|---|---|---|
| Defendants Guilty | 65% | 20% |
| Undecided | 29% | 78% |
| Defendants Not Guilty | 06% | 03% |
| **Total** **N=608** | **100%** | **100%** |

*eight "unsure" respondents were combined with "no"
p. <.001

46.     We see a weaker, but still remarkably strong, pattern when we look at the relationship between simply knowing in what city Pilot Flying J has its headquarters and believing that the defendants are guilty. Of course, many more in the Eastern District know that the headquarters is in Knoxville.

**Table 11. Belief in the guilt of the defendants by knowing where Pilot is headquartered**

| Pilot Headquarters is . . . | Knoxville | Other/DK |
|---|---|---|
| Defendants Guilty | 55% | 22% |
| Undecided | 39% | 77% |
| Defendants Not Guilty | 06% | 01% |
| **Total** **N=608** | **100%** | **100%** |

p. < .001

47.     Recall that we asked the open-ended question as to what family owned Pilot Flying J, and demonstrated many more in the Eastern District could identify the family.  Among those who correctly said "Haslam," 55% believe the defendants are guilty, compared to a mere 19% who cannot name the family that owns Pilot Flying J. The two items just discussed – the location of Pilot's headquarters and the family that owns Pilot Flying J  –  are essentially neutral in their

13

content, but make an important point: a jury pool informed about Pilot Flying J is one significantly biased against the defendants.

48.    As seen in Table 12 below, among those who report having had conversations with other people about the Pilot Flying J criminal prosecutions, 72% say the defendants are guilty, versus 25% who have not had these conversations or are unaware of the prosecution of Pilot Flying J employees.[16] These data clearly show that whatever is being discussed by those conversing about these criminal prosecutions, it is quite deleterious to being an unbiased member of the jury pool—particularly in the Eastern District, where 40% of the eligible jurors report having had such conversations.[17] While we cannot know what was being discussed, it is reasonable to infer at least some of the content was inaccurate, speculative and probably inadmissible at trial.

**Table 12. Belief in the guilt of the defendants by conversations about the case prosecution**

| Had Conversations? | Yes | No/unsure |
|---|---|---|
| Defendants Guilty | 72% | 25% |
| Undecided/Not Aware | 21% | 72% |
| Defendants Not Guilty | 07% | 03% |
| **Total**<br>**N=608** | **100%** | **100%** |

p. < .001

49.    In Table 8 we listed the number of read or heard items about the case that have the clear potential to bias the case against the defendants. Next, we shall demonstrate that having read or heard about case information does indeed create a bias against the defendants.  The more those in the jury pool have read or heard about prejudicial pre-trial publicity, the more likely they are to believe the defendants are guilty, as seen in Table 13 below.

**Table 13. Count of number of prejudicial stories respondents have seen, read or head, and belief that the eight defendants are guilty**

| Count of Stories | Venues Combined % | Defendants are Guilty |
|---|---|---|
| Zero | 45% | 06% |
| One | 12% | 44% |
| Two | 15% | 58% |
| Three | 13% | 74% |
| Four | 09% | 70% |
| Five/Six[18] | 06% | 84% |
| **Total** | **100%** | |

N=624

---

[16] The "undecided/not aware" are those who had read or heard about the prosecution and were undecided and those who had read or heard "nothing" about the government prosecution of Pilot Flying J employees for conspiracy to commit fraud. See question 13 in appendices A and B for exact wording.
[17] Of course, we cannot know what was being discussed.
[18] Six is combined with five as there are only 9 respondents in category six.  Combining the yields 34 respondents.

14

50.     Table 13 shows pre-trial publicity matters.  The more stories respondents have read or heard, ascertained from the results shown in Table 8, the more they are likely to have prejudged the defendants as guilty.  Of course, Table 13 combines both venues, and shows in the middle column the percentage in the combined venues that have read or heard the stories listed.  But recall from Table 8, many more potential jurors have read or heard these prejudicial stories in the Eastern District than in the Middle District.  That discrepancy provides a strong case for moving the case to the Middle District where the visibility of the Pilot Flying J employee prosecution is much less visible.

### X.  Pretrial Publicity Cannot Be Remedied at the Time of the Trial

51.     In his decision to move venue from Lawton, Oklahoma to Denver, Colorado in the case of *United States v. Timothy McVeigh,* Richard Matsch, the trial judge in the case wrote:[19]

> *The existence of such prejudice is difficult to prove. Indeed, it may go unrecognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude.  It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence.*

52.     The academic literature on pre-trial publicity (PTP) supports Judge Matsch's opinion. This literature leaves no doubt that PTP biases jurors' evaluation of the evidence and their ultimate trial decisions. The most detailed peer-reviewed published evidence to this effect is a meta- analysis[20] of 44 empirical studies by a variety of scholars employing different methods of analysis that in total included 5,755 subjects.[21] Steblay and his coauthors concluded that "Subjects exposed to PTP were significantly more likely to judge the defendant guilty compared to subjects exposed to less PTP."  Prejudicial publicity effects were found at all trial stages— pretrial, post-trial but prior to deliberations, and the actual jury deliberations.

53.     PTP provides a "story model" or a set of colored glasses through which the individual evaluates the evidence and interprets facts.  People try to fit the evidence into the preconceived story line rather than evaluating it objectively. They often do not incorporate into their thinking evidence that conflicts with the story model they have constructed prior to the trial.  Jurors will always form a story model, but it should be developed at the trial, not based on information publicity read, heard or seen before the trial even begins.

---

[19] *United States v. McVeigh*, 918 F. Supp. 1467, 1472 (W.D. Okla. 1996).
[20] A meta-analysis allows investigators to combine many studies to leverage greater statistical power as a function of a larger group of subjects.  Idiosyncratic variations in a single study are thus mitigated.
[21] N. Steblay et al., "The Effects of Pretrial Publicity on Juror Verdicts:  A Meta-analytical Review." *Law and Human Behavior* 219 (1999); T. Daftary-Kapur and S. Penrod, "Are Lab Studied on PTP Generalizable?  An Examination of PTP Effects Using a Shadow Jury Paradigm," *The Jury Expert* 1 (2014).

Case 3:16-cr-00020-CLC-HBG   Document 90   Filed 09/30/16   Page 15 of 25   PageID #: 493

## XI. Size of Community

54.     In cases of significant pre-trial publicity the size of the community and its racial and ethnic composition merit consideration. Based on available information, there are 678,417 registered voters in the Eastern District. (Jurors are taken *only* from registered voters in the Eastern District). There are 1,450,122 adults in the Middle District, where jurors are taken from the registered voter pool and from those with a Tennessee driver's license or state identification card. In addition, the Eastern District is very racially and ethnically homogeneous, with 89% of the population being white, 5% African-American, and 3% Hispanic. The Middle District is more diverse with 72% being white, 16% African-American, and 7% Hispanic.[22]

55.     It is frequently argued that the larger and more diverse a community, the less likely that preconceptions about a case will become embedded in the consciousness of those eligible for jury service. There are a variety of communities of interest in a large and diverse metropolitan area which helps protect defendants against inflammatory pretrial publicity. In the case of the trial of Enron CEO Jeffery Skilling, the U.S. Supreme Court upheld a lower-court ruling denying a venue change despite the widespread media frenzy and numerous media stories focusing on heart-rending accounts of persons losing their life savings.[23] The Supreme Court held that the Houston, Texas area with a population of 4.5 million individuals "eligible for jury service" was sufficiently large and diverse to offer protection against jurors biased against the defendant (Skilling) by the pre-trial publicity surrounding the collapse of Enron. The arguments made by the U.S. Supreme Court for keeping the Skilling trial in Houston are consistent with moving the trial of the eight Pilot Flying J employees out of the small and homogeneous Eastern District to the much larger and racially/ethnically diverse Middle District.

## XII. Federal Law and Venue Change

56.     I shall only briefly review federal law regarding grounds for venue change, with the understanding I am not offering a legal opinion and am simply interpreting the data in context to assist the court. Further elaboration may be presented by attorneys representing the defendants. Rule 21(a), Federal Rule of Criminal Procedure, provides:

> *Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.*

57.     It is my opinion that the surveys reported in this declaration show that the eight employees of Pilot Flying J cannot receive a fair trial in the Eastern District of Tennessee, and that a venue change to the Middle District is warranted. In support of this opinion, I shall summarize the results of the Eastern and Middle District surveys and supporting side evidence.

---

[22] American Community Survey, 2015 Release, United States Bureau of the Census
[23] See *Shepard v. Maxwell* 384 U.S. 333, 1966 on why a "circus atmosphere" mandates a change of venue.

**A**. A count of newspaper stories about the Pilot criminal fraud prosecution reveals almost three times as many stories in the *Knoxville Sentinel* than in the Nashville-based *Tennessean*. In virtually every survey awareness question at least twice as many jury-eligible respondents in the Eastern District versus the Middle District had knowledge about Pilot Flying J and events and publicity surrounding the case. Thirty-nine percent in the Eastern District said they had read or heard "a lot" about the "events surrounding the criminal fraud indictment brought by the federal government against these eight Pilot Flying J employees." For the Middle District, only 15% had read or head "a lot" about the events surrounding the indictment. Fifty-two percent in the Eastern District, but only 28% in the Middle District, have seen and heard of the prosecution on television, which in turn is a powerful predictor of a belief than the defendants are guilty.

**B**. Much of the awareness in the Eastern District is of events highly prejudicial to defendants being able to receive a fair trial. Sixty-four percent of the jury eligible in the Eastern District had read or heard about the government's 2013 search warrant and the fact it seized boxes of documents and copied hard drives; 37% knew that people working for Pilot Flying J were pleading guilty in the hopes of a reduced fine or sentence; 37% had read or heard Pilot Flying J had been fined 92 million dollars by the government for its failure by payment rebates owned to customers. This awareness is usually reduced by one-half or more in the Middle District. A count of these six items[24] reveals that jury-eligible respondents in the Eastern District have read and heard a significantly higher total number of the prejudicial items in the Eastern District than the Middle District.

**C.** Half the jury-eligible population in the Eastern District have concluded that the defendants are guilty. In the Middle District, less than half that percentage have so concluded. Instructions to jurors by the trial court to "put any bias aside" have now been thoroughly discredited by research in the behavioral sciences as to not be seriously entertained as a remedy for pre-trial publicity.[25]

**D.** The data show that the more information those in the jury pool have about Pilot Flying J, the more likely they are to believe the defendants are guilty. Importantly, it is not potentially prejudicial information alone that has this unwanted effect. Even for simple straightforward factual questions like in what city is the headquarters of Pilot Flying J located or what is the name of the family that owns Pilot Flying J, those who know the answers are substantially more likely to believe the defendants are guilty than those who do not. The same pattern appears in the case of information that is on its face biasing, such as having read or heard that Pilot Flying J employees were pleading guilty in the hopes of reduced fines and/or prison time.

**E.** Many more jury eligible people in the Eastern District (52%) than the Middle District (28%) have carried on conversations with others about the Pilot Flying J criminal prosecution.

---

[24] I am referring to questions 19, 20, 22, 23, 24, and 25. See Table 8.

[25] Amy Otto et al., "The Biasing Effect of Pre-Trial Publicity on Juror Judgments," *Law and Human Behavior*, Vol 18(4), August 1994

17

These conservations are uniquely destructive to an eligible jury pool member coming to the trial with an open mind. A super majority—fully 72%—of those who reported conversations with others about the criminal prosecution believe the eight Pilot Flying J employees are guilty of criminal conspiracy to commit fraud. A quarter of the jury eligible respondents in the Eastern District (compared to a trivial number in the Middle District) know someone who works for Pilot Flying J or has worked there, and are therefore about twice as likely to believe the defendants are guilty than all others.

**F.** The Eastern District is relatively small and homogeneous. The Middle District is much larger and more heterogeneous. The U.S. Supreme Court in *Skilling* has endorsed a large, heterogeneous venue as an effective remedy for pre-trial publicity.

### XIII. The Limitations of *Voir Dire*

58.     I will start with a proposition that is beyond question in the behavioral sciences: The greater the amount of information a person has about a subject, the more likely a person is to have formed opinions about the subject.[26] The data from this survey is no exception. Information predicts opinion formation, and those who have formed opinions overwhelmingly believe the eight defendants are guilty of conspiracy to commit fraud.

59.     These biases cannot be remedied by instructions from the trial court. It has been shown many times that even after a trial, many jurors do not correctly understand principles of presumption of innocence, burden of proof, and reasonable doubt.[27]

60.     People cannot simply set aside knowledge, belief and opinion relevant to a trial, even when consenting to do so when asked by a judge. As Studebaker and Penrod note in their review of the evidence:[28]

> *Although courts around the world often believe that jurors are able to set aside any preconceived notions about a defendant and base their verdicts solely on the evidence presented at trial, this belief is not supported by the findings from empirical research.*

61.     For example, a study of mock jurors by Schum[29] showed that information held in memory   biased their later interpretations of trial testimony. Nearly half the subjects in this study either disregarded testimony that conflicted with their beliefs and opinions, or interpreted the meaning of the testimony to bring it into line with their preconceptions. This tendency has now been thoroughly documented by recent research in the behavioral sciences.[30]

---

[26] Robert S. Erikson and Kent L. Tedin, *American Public Opinion* (New York:  Pearson 2015), chapter 3.

[27] D. Strawn and R. Buchanan, "Jury Confusion:  A Threat to Justice," *Judicature* 478 (1976)

[28] C. A. Studebaker and S.D. Penrod, "Pretrial publicity and its Influence on Juror Decision-Making," In N. Brewster and K.D. Williams, *Psychology and the Law: An Empirical Perspective* (New York:  Guilford, 2005).

[29] David. A. Schum, "Argument Structuring and Evidence Evaluation," In Reid Haste (Ed.), *Inside the Juror: The Psychology of Juror Decision Making* (New York: Cambridge University Press, 1993).

[30] Milton Lodge and Charles Taber, *The Rationalizing Voter* (Cambridge Press, 2013).

62.     When asked, people say they can be an unbiased juror because this is a response they have been socialized to give in the setting of a courtroom. People want to be seen as good citizens; they want to make a favorable impression on others. There are role expectations associated with serving as a juror, such as being unbiased and impartial. People learn these expectations early in life, and they have a significant effect on adult behavior.

63.     We see social desirability operate in a variety of contexts. One of the best documented instances is when respondents in an opinion survey are asked if they voted in the last election. Their self-declaration can be compared to the poll records to determine if they actually voted. Many who did not vote say that they in fact did vote. In 1996, for example, 49.5 percent of adult population voted. But when asked by the Bureau of Census in its state-of-the-art poll, *The Current Population Survey* (CPS), slightly more than 70 percent said they voted.[31] There is a cultural imperative that good citizens vote. Even in a public opinion survey, when the only person listening to answers is an anonymous interviewer, there is pressure to give socially desirable responses.  Socially desirable responses are given by a substantial number of respondents under a variety of circumstances, not just voting.[32]

64.     When jurors say they can be completely fair or unbiased despite pretrial publicity, most believe it, but research in social psychology indicates that people are often unable to recognize their own biases.[33]  It is unreasonable to expect people to predict how information and biases they hold prior to a trial—and relevant to the trial—may affect their judgments, since they have yet to hear the evidence and arguments that will be presented at the trial.

65.     When pretrial information and/or bias may be present, members of the jury pool are usually asked: "Can you put any bias you might have aside and come to decision based only on the facts and evidence presented during the trial." Affirmative responses to the question—*can you put this bias aside?* —should be viewed with great skepticism. Such affirmative answers are driven by a strong norm that dictates people should be fair and impartial in their role as jurors. People are well aware that the proper and accepted role of a juror is to be unbiased. Given this cultural norm, many will say (with honest conviction) that they can set any bias aside. Even those who have firmly made up their mind on an issue will often say they can *put any bias aside*.

---

[31]Paul Abramson, John Aldrich, and David Rohde, *Change and Continuity in the 1996 Elections* (Washington: CQ Press, 1998); U.S. Bureau of the Census, *Current Population Survey*, Annual Demographic Survey (March 1997 CPS Supplement).
[32] See Robert S. Erikson and Kent L. Tedin, *American Public Opinion*, 9th edition (Pearson 2015), chapter 2.
[33]Richard E. Nisbett and Timothy D. Wilson, "The Halo Effect:  Evidence for Unconscious Alternations of Judgments," *Journal of Personality and Social Psychology* 41 (1978).  The Supreme Court noted in *Irwin v. Dowd,* 366 US  727 (1961) that "no doubt each juror was sincere when he said he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father."  In *Smith v. Phillips,* 455 U.S. 224 (1982) Supreme Court Justice Sandra Day O'Connor noted that "Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have had an interest in concealing his own bias and partly because the juror may be unaware of it."  See also Studebaker and Penrod (op. cit.).

Case 3:16-cr-00020-CLC-HBG   Document 90   Filed 09/30/16   Page 19 of 25   PageID #: 497

66.    A good example of this tendency is seen in the surveys presented by the United States Government (conducted by Donald Vinson of DecisionQuest) in the venue change hearing for Timothy McVeigh and Terry Nichols.  In the DecisionQuest survey in support of a motion to keep the trial in Oklahoma, respondents were asked if they believed McVeigh to be *"guilty, innocent, or do you not know?"* For those who said "innocent" or "guilty," a follow up question was asked:

> *How confident are you of the opinion you have just given?  On a scale from 1 to 5, where 1 is not at all confident and 5 is extremely confident, where would you place yourself?*

67.    Later in the Government survey, respondents were asked:

> *If you were selected to be a member of the jury in the case against Timothy McVeigh, do you think you could be fair and impartial?*

68.    Of those who said McVeigh was *guilty* and that they were *extremely confident* (point 5 on the scale) of their opinion, 61% answered *"yes"* to the above question—that they *could be fair and impartial*—even though less than five minutes earlier they had told an interviewer they were *extremely confident* (the maximum point on the scale) that Timothy McVeigh was guilty.

69.    Any conclusion that jurors with such strong guilt views can put those opinions aside and proceed in an unbiased fashion simply do not pass the common sense test.  It is highly improbable that someone who has just said that *he/she is extremely confident a defendant is guilty* could, in fact, be fair and impartial as a juror. Much social psychological research (as noted above) reports just the opposite. Studies have shown that even in the face of contradictory evidence, people maintain their initial predispositions, new information is interpreted in a way to reinforce previously held attitudes, and people examine evidence less critically when it runs counter to initial predispositions.[34]

70.    When asked, people give the *I can be unbiased* response because in our legal culture we are taught at an early age that our system expects us to be fair and impartial if called for jury duty.  So when asked in a survey, respondents are simply giving what—for lack of a better term—can be called the official line about how responsible citizens should behave.  I submit that this tendency would be even greater when questions are asked in a courtroom setting than when asked in a public opinion survey.  All the symbols present in a courtroom reinforce the norm that responsible citizens are expected to be fair and impartial jurors.

---

[34]L. Ross, M. Lepper and M. Hubbard, "Preservation in Self-Perception and Social Perception:  Biased Attributional Processes in the Debriefing Paradigm, *Journal of Personality and Social Psychology* 32 (1975); C. Lord, L. Ross and M. Leppter, "Biased Assimilation and Attitude Polarization:  The Effects of Prior Theories on Subsequently Considered Evidence," *Journal of Personality and Social Psychology* 37 (1979); P. Ditto and D. Lopez, "Motivated and Skepticism:  Use of Differential Decision Criteria for Preferred and Nonpreferred Conclusions," *Journal of Personality and Social Psychology* 63 (1982).

71. The point is that if preconceptions relevant to evaluating evidence and coming to a decision are widespread in a venue, the solution of asking jurors in *voir dire* if they can be fair and impartial will in no way insure that the defendants in this case can get a fair trial from fair and impartial jurors. Even those with very strong biases are likely to tell the court they can be fair and impartial. In fact, social psychologists have shown, if anything, prejudgments are strengthened during the course of jury trial.[35] These affirmations should not be taken at face value.

72. Worth quoting on the matter of bias is the opinion of Judge Richard Matsch, the trial judge in the case of *United States v. Timothy McVeigh,* in his decision to move the trial from Oklahoma to Denver, Colorado. Judge Matsch wrote:[36]

> *The existence of such prejudice is difficult to prove. Indeed, it may go unrecognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence.*

73. A common response to a motion to change venue in a case where pre-publicity is widespread is to note the size of the eligible jury pool and assert that *among all eligible jurors in the venue, we can certainly find 12 who can put all bias aside and decide this case based solely on the evidence and argument presented during the trial.* This notion is not scientifically supported. In the context of this litigation, the *voir dire* process will not be effective in identifying them.

74. The first reason is that one line of research has demonstrated that *voir dire* has severe limitations because—at best—only partial information can be uncovered. There are a variety of reasons why members of the jury pool are unable to provide complete information during the *voir dire* process. First, few in the general population (and thus the jury pool) have experience speaking in public or before an audience. There will be a certain amount of anxiety associated with speaking out. Such fears are compounded by the intimidating circumstance of a courtroom setting, with an important authority figure (the judge) presiding over matters on an elevated pedestal. Many in the jury pool are anxious and insecure, and conclude the less they say, the less chance they will say something that might embarrass them or that they may later regret.

75. Research on the *voir dire* process shows that a good deal of case relevant information never surfaces. The following studies will serve as illustrations. Broeder[37] and his research staff observed twenty-three jury trials and interviewed 225 jurors after trials had concluded. His analysis showed a number of jurors did not reveal relevant information or prejudicial information

---

[35]C. Lord, L. Ross and M. Lepper, "Biased Assimilation and Attitude Polarization: The Effects of Prior Theories on Subsequently Considered Evidence," *Journal of Personality and Social Psychology* 37 (1979).

[36]*United States v. McVeigh*, 918 F. Supp. 1467, 1472 (W.D. Okla. 1996).

[37]Dale E. Broader, "Voir Dire Examinations: An Empirical Study," *California Law Review* 38 (1965).

during the *voir dire* process. He concluded, "*voir dire* was grossly ineffective not only in weeding out 'unfavorable' jurors but even in eliciting the data which would have shown particular jurors as very likely to prove 'unfavorable.'" Zeisel and Diamond[38] analyzed *voir dire* in twelve trials taking place in federal court. Jurors who did not serve on the juries were asked to remain in court, listen to the evidence and arrive at verdict. Following the trials, the mock jurors were debriefed and asked how they would have decided the cases had they actually been on the jury. Zeisel and Diamond concluded: "On the whole, the *voir dire*, as conducted in these trials did not provide sufficient information for attorneys to identify prejudiced jurors." In a study of 31 criminal trials in the District of Columbia, Seltzer, Venuti and Lopes[39] recorded all questions asked and answers given during *voir dire*. Following the trials, they asked the same questions of 191 people who had actually served as jurors. The authors demonstrated that jurors revealed considerably more factual information and attitudes relevant to the trial *after* the trial was over than during the *voir dire*. For example, in *voir dire* no jurors mentioned any disagreement with due process issues, but in the post-trial interviews many revealed disagreements with due process procedures.

76.     A second point is that the information provided by members of the jury pool is often influenced by the circumstances of the trial. There is vast literature in the behavioral sciences showing a strong tendency for people to give answers that are *consistent*—or at a minimum not inconsistent—with what they perceive to be majority opinion. The *voir dire* process is very intimate, and everyone understands their answers are closely monitored. Cues as to "appropriate" answers quickly become apparent from answers given by others early in *voir dire*—particularly by high status members of the jury pool, as well by the lawyers. People quickly pick up on these cues which influence the responses of many during the venire interview.[40]

77.     Evidence for this sort of "social conformity" goes back to the famous experiments of Solomon Ashe more than 50 years ago.[41] Subjects would be asked to judge the length of a line. However, all subjects but one would be confederates of the experimenter. They would report the line to be longer (or shorter) than it was in actuality. The naive subject, influenced by majority opinion, would follow along and overestimate the true of the length line, or underestimate its true length, depending on opinions expressed by the majority—even though the correct answer was always obvious. When interviewed after the experiment, subjects all said that pressure from others in the group influenced their answers. Many also said they did not really believe the answers they gave, but had gone along out of fear of ridicule or being thought of as "different."

---

[38]Hans Ziesel land Sheri Diamond, "The Effect of Preemptory Challenges on Jury and Verdict: An Experimental Study in Federal District Court," *Stanford Law Review* 30 (1978).
[39]Richard Seltzer et al., Juror Honestly During Voir Dire, 19 *Journal of Criminal Justice* 451 (1991).
[40] Peter D. O'Connell, "Pretrial Publicity, Change of Venue, Public Opinion Polls: A Theory of Procedural Justice," 65 *University of Detroit Law Review* 169 (1988).
[41]Solomon Asch, "The Effects of Group Pressure upon the Modification and Distortion of Judgments." In Harold Guetzkow (Ed.), *Groups, Leadership and Men: Research on Human Relations* (Pittsburgh, Carnegie Press, 1951).

Other research in social psychology has shown that people receive emotional rewards by conforming. People feel pride when conforming to the majority and shame when they fail to conform.[42]

78.     For all the reasons listed above, it is my opinion that the eight employees of Pilot Flying J accused of conspiring to commit criminal fraud cannot get a fair and impartial trial in the United States District Court for the Eastern Tennessee, Southern Division, and that venue should be moved to the United States District Court for the Middle District of Tennessee.

79.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of September, 2016.

Kent Tedin
Professor of Political Science
University of Houston
Houston, Texas

---

[42]Thomas J. Scheff, "Shame and Conformity: The Deference-Emotion System," *American Sociological Review* 53 (1988).

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 30, 2016, a true and correct copy of the foregoing document was filed electronically with the U.S. District Court for the Eastern District of Tennessee. Notice of this filing was served via the Court's electronic filing system on all counsel listed below:

David P. Lewen (david.lewen@usdoj.gov)
F.M. Hamilton III (trey.hamilton@usdoj.gov)
U.S. DEPARTMENT OF JUSTICE
Office of U.S. Attorney
800 Market Street, Suite 211
Knoxville, TN 37902
       *Attorneys for Plaintiff*


Anthony Douglas Drumheller (adrumheller@rustyhardin.com)
Derek S. Hollingsworth (dhollingsworth@rustyhardin.com)
Jennifer E. Brevorka (jbrevorka@rustyhardin.com)
Russell Hardin, Jr. (rhardin@rustyhardin.com)
RUSTY HARDIN & ASSOCIATES LLP
1401 McKinney Street, Suite 2250
Houston, TX 77010
       *Attorneys for Defendant Hazelwood*


Daniel P. Griffin (danny.griffin@millermartin.com)
Eileen H. Rumfelt (Eileen.rumfelt@millermartin.com)
MILLER & MARTIN PLLC (Atlanta)
1180 West Peachtree Street, NW
Regions Plaza, Suite 2100
Atlanta, GA 30309


Roger W. Dickson (roger.dickson@millermartin.com)
Zachary H. Greene (zac.greene@millermartin.com)
MILLER & MARTIN, PLLC (Chattanooga)
832 Georgia Avenue
1000 Volunteer Building, Suite 1200
Chattanooga, TN 37402
       *Attorneys for Defendant Freeman*


Joseph E. Costner (lindahickey@costnergreene.com)
Sarah Bean Smith (sarahsmith@costnergreene.com)
COSTNER & GREENE
315 High Street
Maryville, TN 37804-5009
       *Attorneys for Defendant Borden*

James P. Fleisher (jpf@biesergreer.com)
Joseph C. Oehlers (jco@biesergreer.com)
Michael A. Rieman (mar@biesergreer.com)
BIESER GREER & LANDIS LLP
400 PNC Center
6 North Main Street
Dayton, OH  45402
       *Attorneys for Defendant Spiewak*

Richard Lewis Tennent (Richard@btflaw.com)
BELL TENNENT & FROGGE
414 Union Street, Suite 904
Nashville, TN  37219
       *Attorneys for Defendant Bibee*

Benjamin J. Vernia (bvernia@vernialaw.com)
THE VERNIA LAW FIRM
1455 Pennsylvania Avenue, NW
Suite 400
Washington DC  20004

Cullen Michael Wojcik (wojciklaw@gmail.com)
LAW OFFICE OF CULLEN M. WOJCIK
422 S. Gay Street, Suite 302
Knoxville, TN  37902
       *Attorneys for Defendant Jones*

Jonathan D. Cooper (cooper@knoxdefense.com)
WHITT, COOPER, TRANT & HEDRICK
607 Market Street, Suite 1100
Knoxville, TN  37902

Sara E. Compher-Rice (sara@tndui.com)
Sara E. Compher-Rice (sara@tndui.com)
OBERMAN & RICE
550 Main Street, Suite 730
Knoxville, TN  37902-2567
       *Attorneys for Defendant Mann*


                                          */s/ Eli Richardson*
                                          Eli Richardson