**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **No. 3:16-CR-20** |
| | ) | **JUDGES COLLIER / GUYTON** |
| MARK HAZELWOOD, | ) | |
| SCOTT WOMBOLD, | ) | |
| HEATHER JONES, and | ) | |
| KAREN MANN, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**REPLY IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY OF
GOVERNMENT'S DISCLOSED WITNESS DARREN SEAY**

_____

In reply to the Government's Response (Doc. 234, "Resp.") to the Defendants' Motion in

Limine to Exclude Testimony of Government's Disclosed Witness Darren Seay (Doc. 220,

"MIL"), and in further support of the MIL, Defendants state as follows:

**I.      The Evolution of the Government's Approach to Seay's Testimony Has Narrowed
the Scope of the Issues Still To Be Decided on the MIL.**

As an initial matter, some clarification is required as to the issues currently before the

Court.  In its letter (Doc. 234-2) disclosing and enclosing Darren Seay's March 24, 2017 letter

(Doc. 221-2, "Seay Report"), the Government conveyed that Seay's anticipated lay witness

testimony would cover all of the summaries that were described in and attached to the Seay

Report.  (Doc. 234-2, at 2 ("[T]he focus of Mr. Seay's trial testimony will be the explanation of

the various summaries described in his 3/24/2017 letter . . . .").)  As identified in the Seay

Report, there are four types of such summaries:[1]  (1) Customer Discount Comparison Summaries; (2) Customer Profit Summaries; (3) Rebate Payment Request/Approval Summaries; and (4) Commission-Related Summaries (including Commission Roll-up Diagrams and Commission Breakdown Summaries).[2]  (Seay Report, at 2.)  The MIL, and Defendants' memorandum of law in support of the MIL (Doc. 221, "Defendants' Brief"), sought to exclude Seay's purported lay opinion testimony regarding all four types of summaries.

In its Response, however, the Government now indicates that Seay's testimony under Rule 701 would relate not to all four kinds of summaries, but only to one type of summary—the Customer Discount Comparison Summaries.  The Response so signifies in multiple ways.  First, the introductory portion of the Response refers only to the Customer Discount Comparison Summaries.  (*See* Resp. 1-2.)  Second, the entirety of the Government's argument under Rule 701 addresses only the Customer Discount Comparison Summaries.  (*See id.* at 11-19.)  Third, the Response specifically notes that Seay will not testify at all (whether or not under Rule 701) regarding the Commission-Related Summaries.  (*Id.* at 3 n.2.)

The Government thus appears to concede that Seay's opinions as to the Customer Profit Summaries, the Rebate Payment Request/Approval Summaries, and the Commission-Related Summaries are not admissible under Rule 701.  For this reason (as well as the reasons set forth in Defendants' Brief), the Court should reject any attempt by the Government to introduce Seay's opinion testimony as to these summaries under Rule 701.[3]

---

[1] The Government's description of Seay's role in preparing the various summaries changes throughout the Response.  Sometimes Seay's work is described as "his calculations," "his conclusions," or "the summaries Mr. Seay prepared" (Resp. 1, 2, 7, 13, 23); other times Seay is said to have merely "supervised the creation" of them (*id.* at 3, 22, 23, 24).

[2] As reflected in the footnote immediately below, for some reason, the Government uses alternative names in its Response for the first three categories of summaries.

[3] It appears that the Government does intend to have Seay offer *some* testimony regarding two of these three kinds of summaries—namely the Customer Profit (or "P&L") Summaries and the Rebate Payment Request/Approval (or "Request/Approval") Summaries—albeit apparently not lay opinion testimony under Rule 701.  Specifically, the

That conclusion leads to the question of whether Seay could provide expert testimony on the summaries under Rule 702. In its Response, the Government asserted that he could, claiming that Rule 702 was a valid alternative basis for the admission of Seay's opinion testimony. (Resp. 19-21.)[4] The Government, however, filed a Supplement to its Response (Doc. 236, "Supplement") withdrawing that assertion. The Supplement notes that the Response contains multiple recitations of a significant incorrect statement—that Defendants had served no expert disclosures. The Supplement also declared that the Government will rely solely upon Rule 701 (to the exclusion of Rule 702) as a basis for the admission of Seay's testimony. The language the Government presumably intends to withdraw (because it asserts the incorrect factual assertion and/or the admissibility of Seay's testimony under Rule 702) appears in the Response at page 2, lines 7 through 13; the majority of page 10 and the corresponding Exhibit 8; page 11, lines 1 and 2; a clause in the middle of page 19; and the entirety of Section II.B (pages 19-21). Pursuant to the Supplement, that language and Exhibit 8 to the Response should be wholly disregarded in considering Defendants' MIL.[5]

The result of these changes is that only one area of Seay's opinion testimony remains at issue—the Customer Discount Comparison Summaries—and the only asserted basis for the admission of that testimony is Rule 701. This reply will be limited accordingly.

---

Government states that it will offer such summaries into evidence under Rule 1006 "through [Seay's] testimony." (Resp. at 23, 24.) Regarding the fourth kind of summary, Customer (or "Cost-Plus") Discount Comparison Summaries, the Government intends for it to be both introduced through Seay's testimony and the subject of opinion testimony from Seay under Rule 701.

[4] The Government was unclear as to whether it was asserting Rule 702 as a vehicle for testimony regarding all of the summaries (except for the Commission-Related Summaries, which the Government had indicated would not be covered by Seay's testimony, as noted above) or just the Customer Discount Comparison Summaries. In any event, as discussed herein, the Government no longer asserts Rule 702 as a basis for testimony regarding any of the summaries.

[5] Though Defendants urged the Government to file an amended response omitting these inaccuracies to avoid this confusion, the Government declined to do so.

## II.    Seay's Testimony Is Inadmissible Under Federal Rule of Evidence 701.

The Government has failed to establish that Seay's proposed testimony satisfies the requirements of Rule 701.  Despite the Government's attempt to conflate Rule 701(a) and (c) into a single hurdle, these provisions actually present two different obstacles to admission. Under these rules, the Government bears the burden of demonstrating that Seay's testimony is both "rationally based on [his] perception" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  *See, e.g.*, Fed. R. Evid. 701(a), (c); *United States v. Williamson*, 656 F. App'x 175, 186-87 (6th Cir. 2016) (citing *United States v. Freeman*, 730 F.3d 590, 595-96 (6th Cir. 2013)).  The Government has not met and cannot meet its burden of showing that Seay possesses any knowledge arising from his regular duties at Pilot regarding the Customer Discount Comparison Summaries or any firsthand knowledge of the facts underlying those Summaries; to the extent that he possesses any relevant knowledge, it is specialized or technical in nature.  Therefore none of his opinion testimony is proper under Rule 701.

A.    Seay's Opinions Arise from His Specialized, Technical Knowledge and Not by Virtue of Particularized Knowledge He Gained from His Position or Experience at Pilot.

The Government cannot satisfy Rule 701(c).  First, Seay's technical methods and opinions are precisely the type of testimony permitted only from experts under Rule 702. Second, Seay's opinions lack the independent reliability afforded to lay witnesses under Rule 701 because he has no contemporaneous, particularized knowledge of the factual basis of his opinions.  Seay's specialized, after-the-fact knowledge renders his opinions potentially admissible only under Rule 702, and because the Government is foreclosed from pursuing that option, his opinions should not be presented to the jury.

4

### 1. *Seay's Proposed Opinion Testimony Is Expert in Nature.*

Seay's clear reliance on his technical expertise in providing his proposed opinion testimony is impermissible under Rule 701(c). "[I]n considering the third prerequisite for lay opinion testimony, a court must focus on 'the reasoning process' by which a witness reached his proffered opinion. If the opinion rests 'in any way' upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (quoting 4 *Weinstein's Federal Evidence* § 701.03[1]). Seay purportedly created the Customer Discount Comparison Summaries using the Power Pivot Manual Rebate Tool and the Power Pivot Repricing Tool (the creation of which he claims to have supervised), but he provides no explanation of what these tools are or how they work. (Seay Report, at 3-5 (stating that the "Power Pivot Manual Rebate Tool generates calculations based on information located within Pilot's Lawson, Ascend, and PC9PROD/STORETRAN databases, in addition to PRS data located within the PriceFetch database," but providing no discussion of how the tool generates those calculations).) The Government describes them as "power pivot tables" and provides a definition of "pivot table" from Wikipedia.[6] (Resp. 5 & n.4.)

Seay's Report describes—in scant, but highly technical detail—his analysis of manual rebates for several customers.[7] (Seay Report, at 3-5.) As best as Defendants can determine, Seay's manual rebate calculation includes the following elements:

---

[6] The Government gives no indication of how it would introduce that definition to the jury through admissible evidence. Defendants can only assume that the Government expects to have Seay provide such testimony.

[7] Seay also analyzes off-invoice discounts for one customer, Queen Transportation, but his Report provides too little information concerning his "Power Pivot Repricing Tool" for Defendants to even guess at the sources and methods underlying that analysis.



Chart 1

This schematic reveals the highly technical and specialized nature of Seay's proposed testimony, which represents a tertiary distillation of vast quantities of data.

Contrary to the Government's claims, Defendants have received access to only some of the databases and sources that are the foundation of Seay's conclusions (represented as "*A*" in Chart 1). The Government provided copies of the massive Lawson and Ascend databases, but not PC9PROD/STORETRAN or PriceFetch, which in turn includes an undescribed set of data from a third party, PRS. These undisclosed data sources are identified by the dashed-line box in Chart 1. Nor has the Government provided any information about the queries (represented as "*B*" in Chart 1) used to draw data from those databases.

Although Seay has provided copies of his "Power Pivot Manual Rebate Tool" (represented as the labeled, rounded box in Chart 1), it is clear from its structure and complexity that it is the product of specialized, technical knowledge. The tool consists of an Excel

spreadsheet of the type familiar to most computer users, but that spreadsheet draws from an underlying "data model" that is normally inaccessible and itself unverifiable by Defendants, the Court, or the jury. Seay took the results of this spreadsheet's calculations (a process represented as "*D*" in Chart 1) and summarized them in the "Manual Rebate Comparison Summary."

Seay's opinions rest on his technical knowledge and thus are not admissible under Rule 701. For his opinions to be helpful to the jury in any way, Seay will be required to explain what the Power Pivot Manual Rebate Tool and the Power Pivot Repricing Tool are and what they are designed to do. In addition, Seay describes his tools as "accurately" pulling data and calculating amounts owed to customers—such testimony would necessarily involve and require an examination into Seay's methodology, which would undoubtedly be highly technical. (*See* Seay Report, at 2.) The explanation of what the tools are, how they work, how they were designed, and how they can be deemed to be "accurate" requires specialized knowledge that is "manifestly outside the ken of the average juror's experience in everyday life." *See Munoz v. United States*, No. 07-CV-2080, 2008 WL 2942861, at *22 (E.D.N.Y. July 28, 2008). These "data processing tools" are by no means a "process of reasoning familiar in everyday life" and instead represent "a process of reasoning which can be mastered only by specialists in the field"—i.e., an expert. *See* Fed. R. Evid. 701, advisory committee's note (2000) (quotation omitted). Any testimony by Seay as to the creation or use of those tools in forming his opinions thus falls squarely within the type of testimony "based on scientific, technical, or other specialized knowledge" prohibited under Rule 701.

Where an interpretation of the results of a software program would require the purported lay witness "to apply knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson . . . this constitutes 'scientific, technical, or

other specialized knowledge' within the scope of Rule 702." *United States v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006). This type of technical analysis appears to be exactly what Seay has done. He applied, in a manner far beyond the abilities or understanding of the average layperson, his knowledge of computers and software—including the power pivot tables. Like the forensic software in *Ganier*, Seay designed his tools specifically for use in investigations and litigation to interpret the underlying data. This type of knowledge falls within the ambit of Rule 702, not Rule 701, rendering Seay's testimony inadmissible in this case.

## 2. *Seay Has No "Particularized" Knowledge Informing His Opinions.*

Seay also lacks the kind of particularized knowledge that enables a lay person to offer opinion testimony under Rule 701. Lay opinions are admissible only if the witness has "particularized knowledge . . . by virtue of his or her position in the business," such as knowledge arising from the "company's day-to-day operations." *See* Fed. R. Evid. 701, advisory committee's note (2000); *DJIO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 686 (5th Cir. 2003). Rule 701 requires such firsthand knowledge to ensure the testimony is reliable. *See United States v. Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010); *see also* Fed. R. Evid. 701, advisory committee's note (2000) ("Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."). A lay witness may "testify factually from his personal knowledge and experience" but not "from the perspective of an expert following a review of documents or data in anticipation of litigation." *CIVIX-DDI v. Hotels.com, LP*, No. 05 C 6869, 2012 WL 6591684, at *3-4 (N.D. Ill. Dec. 18, 2012); *see also Krutko v. Franklin Cty.*, No. 2:11-CV-610, 2016 WL 455397, at *4 (S.D. Ohio Feb. 5, 2016); *Kmart Corp. v. Footstar, Inc.*, No. 09 CV 3607, 2012 WL 5389727, at *6 (N.D. Ill. Nov. 2, 2012) ("[A]n individual must be disclosed

as an expert if his knowledge was acquired or developed in anticipation of litigation or for trial." (quotations omitted)); *Champagne Metals v. Ken-Mac Metals, Inc.*, No. CIV-02-0528, 2009 WL 10672256, at *7 (W.D. Okla. Feb. 25, 2009) (excluding information that was "prepared in anticipation of this litigation rather than being based on the books and records of plaintiff in the ordinary course of its business," and the opinions based on that information, as inappropriate lay testimony).[8] Opinion testimony prepared solely in anticipation of litigation brings the reliability of the testimony into question. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007) (discussing reliability in the context of experts for hire); *see also EEOC v. Sharp Mfg. Co. of Am.*, No. 06-2611, 2008 WL 189847, at *3 (W.D. Tenn. Jan. 22, 2008) (refusing to admit documents "gathered in anticipation of litigation" under Fed. R. Evid. 803(6) because "they do not have the indicia of reliability").

Seay's proposed testimony based only on knowledge he acquired during the post-raid audit is simply not admissible under Rule 701. In its Response, the Government concedes that nothing in Seay's 15-year tenure at Pilot provided him with any particularized knowledge relevant to the Customer Discount Comparison Summaries, other than his work on Pilot's internal audit in the brief period following the 2013 FBI raid. The Response explicitly states that "Mr. Seay's calculations are based *entirely* upon his use of data-processing tools . . . that in his capacity as an in-house Pilot employee he oversaw the creation of for use during his supervision of Pilot's internal audit . . . ." (Resp. 13 (emphasis added); *see also id.* at 3 ("In reaction to both the government's overt investigation and a subsequent class action civil lawsuit . . . , Pilot undertook an internal audit of thousands of its accounts for trucking company customers who

---

[8] This rule is reflected in the requirements for expert disclosures in civil litigation. *See* Fed. R. Civ. P. 26, advisory committee's note (1970) (distinguishing experts "retained by [a] party in relation to litigation" from "the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit," who "should be treated as an ordinary witness").

received Cost-Plus discounts for diesel fuel purchases from Pilot.").)[9]  The Government cites no other experience or particularized knowledge acquired by Seay through his employment at Pilot as a basis for admitting his testimony under Rule 701.  Indeed, it appears that Seay had no other experience, at Pilot or anywhere else, with rebates or discounts, the calculation of customer savings, the Lawson or Ascend databases, or the calculation of retail pricing and cost of fuel.[10]  Seay acquired any knowledge relevant to his proffered opinions only through Pilot's post-search examination of rebates and discounts, and not through his usual, day-to-day responsibilities.[11]  *Cf. United States v. Roxworthy*, 457 F.3d 590, 593-94 (6th Cir. 2006) (holding, for purposes of the work product privilege, that documents are prepared in anticipation of litigation if the party has an actual and reasonable belief "that litigation was a real possibility").  As such, his participation in the internal audit, performed in anticipation of litigation and not as part of his regular duties at Pilot, does not bring the same indicia of reliability as the experience of the lay witnesses in the cases cited by the Government.[12]  Seay's opinions therefore should not be

---

[9] Indeed, the Government makes clear that the data processing tools that form the basis of Seay's opinions were themselves created as part of that investigation and did not exist at the time of the events at issue.  (Resp. 5 ("To support Pilot's internal audit . . . , Mr. Seay oversaw the creation of the power pivot tables referenced above – namely the Manual Rebate Tool and the Off-Invoice Tool.").)

[10] Though Seay claims to have experience in fuel accounting at Pilot, Defendants understand that that experience is limited to the supply side—i.e., Pilot's purchase of fuel from suppliers and transportation of that fuel to retail locations—and has nothing to do with Pilot's customer accounts.

[11] Defendants believe that Pilot's efforts after the search were patently more focused on pleasing anxious customers as quickly as possible than on ascertaining precisely the objective truth of whether customers were underpaid and by how much.  In many cases, Pilot authorized "repayments" to customers despite believing that no amount—or a much lower amount—was owed.

[12] *See United States v. Kerley*, 784 F.3d 327, 338-39 (6th Cir. 2015) (permitting testimony from underwriting representatives who had "personal knowledge of their respective employers' underwriting and lending guidelines, policies, and procedures" and "had experience in applying those guidelines and policies to mortgage loans during that time"); *United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010) (permitting a company's chief risk officer to provide the kind of "analysis he regularly performed when evaluating risk tolerances"); *Lativafter Liquidating Trust v. Clear Channel Commc'ns, Inc.*, 345 F. App'x 46, 50-51 (6th Cir. 2009) (finding particularized knowledge of a company's value based on the witness's research into the company's financials and position on the board); *United States v. White*, 492 F.3d 380, 403-05 (6th Cir. 2007) (permitting testimony from Medicare auditors who had audited cost reports submitted by the defendants and/or had personal interactions with the defendants); *United States v. Rigas*, 490 F.3d 208, (2d Cir. 2007) (permitting an accountant to testify about his review of the company's accounting records and how he "merely 'd[id] the math'").

admitted under Rule 701 and would be appropriate only if they were to pass the rigorous reliability analysis of Rule 702, which the Government is not pursuing in this case.

      B.    <u>Seay Lacks Personal Knowledge of the Facts and Opinions to Which He Proposes To Testify</u>.

Seay has no contemporaneous, firsthand knowledge regarding the facts underlying the Customer Discount Comparison Summaries. As discussed above, Seay was not involved in any of the transactions or business units at issue at the time of the alleged fraud and familiarized himself with those facts only as part of Pilot's post-raid internal audit. Seay's knowledge of the facts is, by definition, second-hand because he acquired it with no contemporaneous perception whatsoever. *See, e.g.*, *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204 (4th Cir. 2000) (finding no personal knowledge where a lay witness's "sole basis of knowledge concerning the accident derived from his investigation and his analysis of the data he collected"). The Government does little to address this requirement, arguing only that "Seay 'personally perceived' how the Manual Rebate Tool and Off-Invoice Tool were constructed to aggregate data to facilitate Pilot's audit of Cost-Plus discounts to thousands of its customers." (Resp. 14-15.) That argument may be relevant to show that Seay has personal knowledge of the *data processing tools* he helped to create. But the argument does nothing to satisfy the Government's burden of showing that Seay has the personal knowledge truly at issue—knowledge of the *data fed into* those tools.

Indeed, Seay himself reveals that he has no such personal knowledge of that data and that it was instead supplied by others at Pilot: "The Lawson Payments tab contains information provided by Pilot's Accounts Payable department during the course of the post-April 15, 2013, audit of accounts, and which queried Pilot's Lawson database for rebate payments." (Seay

Report, at 3.)[13]  "[B]ecause Rule 701 limits the admissibility of lay opinions at trial to those based only on personal perceptions, an opinion . . . which appears to have been based on the totality of information gathered by various persons in the course of an investigation" is not admissible.  *Garcia*, 413 F.3d at 211-13 (finding that a witness who "relies on the 'entirety' or 'totality' of information gathered in an investigation . . . is not presenting the jury with the unique insights of an eyewitness's personal perceptions").  Here, as in *Garcia*, Seay's opinions are based on the work of others, performed during the post-raid investigation, and are not based on his own personal perception of the relevant events.

> Along the same lines, the Sixth Circuit has explained:
>
> We have on occasion allowed witnesses to apply specialized knowledge while giving lay testimony.  However, the 2000 amendment to Federal Rule of Evidence 701 clarified that lay opinions or inferences cannot be based on "scientific, technical, or other specialized knowledge within the scope of Rule 702."  Even before the amendment, witnesses who performed after-the-fact investigations were generally not allowed to apply specialized knowledge in giving lay testimony.

*Ganier*, 468 F.3d at 926-27 (citations omitted).  Based on these principles, in *Ganier* the Sixth Circuit held that "the district court did not err by concluding that [the purported lay witness's] proposed testimony could be offered only pursuant to Rule 702."  *Id.* at 927.  The same result should apply here.

> Furthermore, Seay's opinions turn on assumptions that did not result from his own perceptions but rather were supplied to him by the Government.  The Government denies that it directed Seay as to the content of his opinions and instead states that "[t]he Cost-Plus Discount Comparison Summaries (Exhibit 3) for alleged victim customers Amerifreight, B.P. Express, Halvor, JTL, Queen, and Ryder show that the 'assumed discount[s]' identified by the U.S.

---

[13] Some of the information—namely the "PRS data located within the PriceFetch database" (Seay Report, at 4)—appears to have come from a third party, PRS.

Attorney's Office for the Seay Discount-Comparison Calculations were merely the falsely promised discounts for each of those customers alleged in the Indictment as set forth in the table above." (Resp. 6-7.) The Government, however, provides no support for the implication that an assumption does not violate the personal knowledge requirement of Rule 701 so long as it happens to derive from an indictment.

Even if that proposition were true, it would be inapplicable in this case because some of Seay's assumptions are not derived from the Indictment. The "table above" referenced by the Government identifies, for example, only one "Alleged Falsely Promised Discount" from the Indictment for Halvor: "Cost-Minus .05." (Resp. 5; Amended Superseding Indictment (Doc. 182) ¶ 28(j)(1)-(2).) An examination of the Cost-Plus Discount Comparison Summaries attached as Exhibit 3 to the Government's Response, however, reveals that Seay performed his analysis using three different "assumed discounts"— not just Cost Minus 0.05, but also Cost Minus 0.025 and Cost Minus 0.055. (*See* Doc. 234-3, at 3-5.) It appears that the Government inaccurately stated how it identified the "assumed discounts" for Seay to use, or that Seay did not follow the Government's instructions when he used "assumed discounts" not alleged in the Indictment. Either way, the basis for Seay's adoption of these assumptions is entirely undisclosed and unsubstantiated; these assumptions do not all come from the Indictment, and even if they did, that would not make them accurate or otherwise appropriate. Thus, whatever conclusions Seay bases on those assumptions are not reliable.

Finally, the United States has failed to—and cannot—establish a proper foundation for the admissibility of Seay's testimony because not even Seay himself claims to have accurately recreated the methods by which allegedly "proper" rebate payments and discounts would have

been made but for the alleged fraud.  Moreover, as discussed below, the Government has alleged that some of the data sources Seay used were manipulated.

Because Seay's opinions are based on something (including unvalidated assumptions and the after-the-fact work of other persons) other than his personal knowledge gained during his day-to-day employment activities, those opinions are not admissible under Rule 701.

## III.    None of Seay's Summaries Are Admissible Under Federal Rule of Evidence 1006.

The Government next argues for the admissibility of three (of the four) kinds of summaries under Rule 1006.  However, this argument is inapposite to the admissibility of Seay's opinions under Rule 701, which is the only issue raised by the MIL.  The admissibility of the purported 1006 summaries (whether through Seay or some other witness) is an issue entirely distinct from whether Seay can provide opinion testimony under Rule 701.

The Government's attempt to raise what is essentially an affirmative motion in limine via its Response to Defendant's MIL, and after the deadline for filing motions in limine has passed, is inappropriate.  However, to the extent the Court wishes to entertain the Government's arguments under Rule 1006 at this time, those arguments are without merit.

First, with respect to the Cost-Plus Discount Comparison Summaries in particular, they are not admissible under Rule 1006 because "[a] summary exhibit cannot provide the proponent's opinion testimony."  *BP Exploration & Prod. Inc. v. Cashman Equip. Corp.*, No. H-13-3046, 2016 WL 1387907, at *7 (S.D. Tex. Apr. 8, 2016); *see also United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (finding that Rule 1006 summaries should not be "embellished by or annotated with the conclusions of or inferences drawn by the proponent").  The Discount Comparison Summaries undeniably reflect Seay's purported opinions, as the Government itself makes clear.  (*See* Resp. 1-2, 11-19.)  Those summaries, in fact, comprise the only opinions of

Seay discussed by the Government in its Response. Because the summaries contain inference and opinion, they are inadmissible under Rule 1006.

Second, with respect to summaries generally, they are not merely summaries of data— they are summaries of summaries (of, in some cases, summaries). The Discount Comparison Summaries, for example, are compilations of information Seay purportedly derived from application of the Manual Rebate Tool and the Off-Invoice Tool, both of which are described by the Government as being "power pivot tables." (Resp. 5.) According to the Government, however, a "pivot table" is a "data summarization tool" that "can automatically sort, count, total or average" data stored elsewhere. (*Id.* at 5 n.4.) Thus, it appears that (1) the Discount Comparison Summaries are summaries of the pivot tables, (2) the pivot tables are themselves summaries (and calculations) of query results from the various Pilot databases, and (3) the query results are themselves summaries of portions of the raw data contained in the databases. In other words (and as shown in Chart 1), Seay's summaries purport to describe, in a handful of numbers, the triple distillation of millions of data points. In addition to attenuating their status as "summaries" (of the content of documents) of the kind admissible under Rule 1006, the summary-within-summary-within-summary nature of the Discount Comparison Summaries calls into question whether the Government will be able to satisfy the fifth requirement of *Bray*, i.e., that the "proponent should present the testimony of the witness who supervised its preparation." 139 F.3d at 1110. Seay purportedly supervised the preparation of some portions of the summaries, but other portions apparently were prepared under the supervision of different Pilot employees. (*See, e.g.*, Decl. of John Lowery Concerning Off-Invoice Comparison Summary, Column 6 (Doc. 234-12) (declaring how portions of the Off-Invoice Comparison Summary were created from other summaries, but failing to identify who supervised the creation of those

summaries); Decl. of John Lowery Concerning Pilot Travel Centers Profit and Loss Statement Summaries (Doc. 234-14) (declaring how portions of the Profit and Loss Statement Summaries were created from other summaries, but failing to identify who supervised the creation of those summaries).)  Because the provenance of this information is not yet established, the admissibility determination of these summaries is premature.

Third, the Government has not demonstrated that certain of the summarized documents are sufficiently voluminous to justify use of the summaries, as is required by the first element of *Bray*.  *See* 139 F.3d at 1109.  A review of each of the summaries shows that, for Amerifreight Systems, the "summary" is of only one transaction—hardly a voluminous amount of information.  (*See* Docs. 234-3, 234-4, 234-5.)  Similarly, the purported exhibits "summarize" only two transactions for Ryder Truck.  (*Id.*)  Though, as discussed above, some of Seay's summaries encompass exceedingly numerous and complex underlying records, which are summaries themselves, his third-level summary of only one or two transactions is inappropriate under Rule 1006.  Where the information being summarized is not voluminous, the Government should be required to introduce it in its original form.

Fourth, though the Government asserts that the Discount Comparison Summaries satisfy the third element of *Bray* because the documents they summarize are business records and thus not hearsay under Rule 803(6), the Government has not established all of the requirements for applying the business records exception.  For example, though the Government argues that query results of electronic databases may constitute business records, the Government is first required to establish that the information inputted into the database is reliable and trustworthy.  *United States v. Nixon*, 694 F.3d 623, 634 (6th Cir. 2012) (quoting *United States v. Russo*, 480 F.3d 1228, 1240 (6th Cir. 1973)) ("'[O]nce the reliability and trustworthiness of the information put

into the computer has been established, the computer printouts should be received as evidence of the transactions covered by the input.'"). That reliability and trustworthiness has by no means been established; indeed, the databases contain the very information alleged to have been manipulated in this case. The Government cannot establish that the underlying records should be admitted under the business records exception to hearsay, and thus the summaries of those records are not admissible.

## <u>CONCLUSION</u>

For the foregoing reasons, and based on the entire record in this matter, Defendants' MIL should be granted, and Seay's proposed opinion testimony should be excluded. Furthermore, to the extent the Court treats the Government's Response as containing a cognizable affirmative request for a ruling that its summaries are admissible under Rule 1006, that request should be denied.

Respectfully submitted,

*/s/ Robert K. Platt*
Robert K. Platt (Admitted *Pro Hac Vice*)
John E. Kelly (Admitted *Pro Hac Vice*)
BASS, BERRY & SIMS PLC
1201 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20004
(202) 827-2750 – Telephone
rplatt@bassberry.com
jkelly@bassberry.com

*/s/ Eli Richardson*
Eli Richardson (BPR #: 023443)
BASS, BERRY & SIMS, PLC
150 Third Avenue South Suite 2800
Nashville, Tennessee 37201
(615) 742-7825 – Telephone
(615) 742-0416 – Facsimile
erichardson@bassberry.com

**Attorneys for Defendant Scott Wombold**

*/s/ Russell Hardin, Jr. (with permission)*
Anthony Douglas Drumheller
Derek S. Hollingsworth
Jennifer E. Brevorka
Russell Hardin, Jr.
RUSTY HARDIN & ASSOCIATES LLP
1401 McKinney Street, Suite 2250
Houston, TX 77010
(713) 652-9000 – Telephone
(713) 652-9800 – Facsimile
rhardin@rustyhardin.com

**Attorneys for Defendant Hazelwood**

*/s/ Benjamin J. Vernia (with permission)*
Benjamin J. Vernia
THE VERNIA LAW FIRM
1455 Pennsylvania Avenue, NW
Suite 400
Washington DC 20004
(202) 349-4053 – Telephone
(866) 572-6728 – Facsimile
bvernia@vernialaw.com

Cullen Michael Wojcik
LAW OFFICE OF CULLEN M. WOJCIK
422 S. Gay Street, Suite 302
Knoxville, TN  37902
wojciklaw@gmail.com

**Attorneys for Defendant Jones**

*/s/ Jonathan D. Cooper (with permission)*
Jonathan D. Cooper
WHITT, COOPER, TRANT & HEDRICK
607 Market Street, Suite 1100
Knoxville, TN  37902
(865) 524-8106 – Telephone
(865) 546-6637 – Facsimile
cooper@knoxdefense.com

Sara E. Compher-Rice
OBERMAN & RICE
550 West Main Avenue
Suite 730
Knoxville, TN 37902-2567
sara@tndui.com

**Attorneys for Defendant Mann**

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 4, 2017, a true and correct copy of the foregoing document was filed electronically with the U.S. District Court for the Eastern District of Tennessee. Notice of this filing was served via the Court's electronic filing system on all counsel listed below:

David P. Lewen (david.lewen@usdoj.gov)
F.M. Hamilton III (trey.hamilton@usdoj.gov)
U.S. DEPARTMENT OF JUSTICE
Office of U.S. Attorney
800 Market Street, Suite 211
Knoxville, TN 37902
  *Attorneys for Plaintiff*

Anthony Douglas Drumheller (adrumheller@rustyhardin.com)
Derek S. Hollingsworth (dhollingsworth@rustyhardin.com)
Jennifer E. Brevorka (jbrevorka@rustyhardin.com)
Russell Hardin, Jr. (rhardin@rustyhardin.com)
RUSTY HARDIN & ASSOCIATES LLP
1401 McKinney Street, Suite 2250
Houston, TX 77010
  *Attorneys for Defendant Hazelwood*

Benjamin J. Vernia (bvernia@vernialaw.com)
THE VERNIA LAW FIRM
1455 Pennsylvania Avenue, NW, Suite 400
Washington DC 20004

Cullen Michael Wojcik (wojciklaw@gmail.com)
LAW OFFICE OF CULLEN M. WOJCIK
422 S. Gay Street, Suite 302
Knoxville, TN 37902
  *Attorneys for Defendant Jones*

Jonathan D. Cooper (cooper@knoxdefense.com)
WHITT, COOPER, TRANT & HEDRICK
607 Market Street, Suite 1100
Knoxville, TN 37902

Sara E. Compher-Rice (sara@tndui.com)
OBERMAN & RICE
550 West Main Avenue, Suite 730
Knoxville, TN 37902-2567
*Attorneys for Defendant Mann*

/s/ Eli Richardson
Eli Richardson

23645910.2